966 F.2d 1541
 22 Envtl. L. Rep. 21,397
 STATE OF CALIFORNIA, ex rel. STATE WATER RESOURCES CONTROL
BOARD; State of California, ex rel. California Department
of Fish & Game; Edison Electric Institute; National
Hydropower Association, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
PACIFIC GAS AND ELECTRIC COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
HENWOOD ASSOCIATES, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
AMERICAN RIVERS, INC.; Friends of the River, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 90-70203, 90-70320, 90-70360, 90-70366, 90-70367,
90-70463 and 90-70371.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 20, 1991.
Decided April 3, 1992.
 
 Michael W. Neville, Deputy Atty. Gen. of the State of Cal., San Francisco, Cal., for petitioner State of Cal., ex rel. State Water Resources Control Bd. Gail Ann Greely, Greely & Greely, Alameda, Cal., for petitioner-intervenor Henwood Associates and petitioner Nat. Hydropower Ass'n, Inc. Louis E. Vincent for petitioner Pacific Gas and Elec. Co. Henri D. Bartholomot for petitioner Edison Elec. Institute. Denis D. Smaage, Deputy Atty. Gen. of the State of Cal., Sacramento, Cal., for petitioner State of Cal., ex rel. California Dept. of Fish & Game. John D. Echeverria, Washington, D.C., for petitioners American Rivers, Inc. and Friends of the River.
 Samuel Sooper, U.S. Dept. of Justice, Washington, D.C., for respondent.
 John Bryson, Bureau of Land Management, U.S. Dept. of Justice, Washington, D.C., for amicus.
 Petition to Review a Decision of the Federal Energy Regulatory Commission.
 Before: ALARCON, T.G. NELSON, Circuit Judges, and PRICE, District Judge.*
 T.G. NELSON, Circuit Judge.
 
 
 1
 A group of conservation organizations, two state agencies, the project sponsor and several hydropower industry representatives challenge the Federal Energy Regulatory Commission's (FERC or Commission) issuance of a license for a small hydroelectric project in California. Petitioners raise issues concerning the Commission's decisions relating to the stream flow regime, undue Congressional influence, waiver of state certification under the Clean Water Act, and the necessity of obtaining a special use authorization from the Bureau of Land Management of the Department of Interior (BLM). We deny the Commission's motion to dismiss the petitions relating to the BLM issue, and grant the petitions for review as to that issue. We deny the petitions for review on all other issues.
 
 BACKGROUND
 
 2
 Henwood Associates, a closely held corporation engaged in hydropower development in California, proposes to construct a hydroelectric power project at Dynamo Pond on Green Creek, a tributary of the East Walker River in Mono County, California. Henwood's plans include the rehabilitation of a small dam that had created Dynamo Pond and diversion of some of the stream's flow through a buried penstock for power generation. In addition, a buried electric transmission line would connect the powerhouse to the distribution system of Southern California Edison Company. A portion of both the penstock and the transmission line would be located on BLM lands administered under the Federal Land Policy and Management Act (FLPMA), included in the project area as shown in Henwood's filing with FERC. The rest of the project facilities would be located on private land leased to Henwood.
 
 
 3
 On December 19, 1980, Henwood applied to BLM for a right-of-way authorization pursuant to Section 501(a)(4) of FLPMA, 43 U.S.C. § 1761(a)(4). On January 26, 1986, Henwood filed an application with FERC for a hydroelectric license for the Dynamo Pond project. On December 23, 1987, the Director of the Office of Hydropower Licensing (OHL) issued a license for the project to Henwood, containing a condition requiring Henwood to maintain minimum stream flows of 5 cubic feet per second (cfs) in Green Creek, rejecting California Fish and Game's (Cal Fish and Game) stream flow recommendations as inconsistent with the purposes of the Federal Power Act (FPA), and finding the California Water Resources Control Board (Cal Water) had waived certification under the Clean Water Act because it had not acted within one year of August 28, 1985, the date Henwood had requested state certification from the Board.
 
 
 4
 On February 10, 1988, Cal Fish and Game filed an appeal of the Director's order issuing the license. On February 17, 1988, FERC issued an order denying Cal Fish and Game's appeal on the ground that it had never intervened in the Henwood licensing proceeding and did not have standing to file an appeal. The Commission also denied the Cal Water's appeal, explaining that its 1987 rule interpreting Section 401(a)(1) of the Clean Water Act provided that state water quality certification will be deemed waived if a certifying agency does not act on a certification request within one year of its receipt of the request.
 
 
 5
 On July 18, 1988, FERC issued a declaratory order, ruling that Henwood was not required to secure a right-of-way permit from BLM in order to proceed with the project. On September 2, 1988, BLM wrote FERC a letter, requesting it rescind this ruling.
 
 
 6
 On March 9, 1989, the BLM issued a right-of-way permit to Henwood pursuant to FLPMA in an action independent of the Commission's licensing proceedings. The BLM permit required higher minimum flows for the project (9 to 15 cfs) than the Commission had required (5 cfs) in the license. Henwood "accepted" the BLM right-of-way "[t]o the extent that the Bureau has permitting authority over this project." Henwood also requested a declaratory order from FERC that BLM lacked authority under FLPMA to require FERC licensees to obtain rights-of-way from BLM.
 
 
 7
 On May 2, 1989, the Commission issued an order reaffirming its view on the water quality certification question, and a declaratory order rejecting BLM's claims that Henwood was required under FLPMA to obtain a right-of-way from BLM and sua sponte granting party status to Cal Water to raise its claims under Section 10(j) of the FPA. FERC instructed its staff to engage in additional negotiations with Cal Fish and Game to attempt to resolve the controversy about the minimum stream flow. FERC deferred Cal Water's appeal of the water certification issue and stayed the Henwood project license pending these negotiations. Commissioner Trabant dissented from FERC's decision to grant Cal Fish and Game party status and to reopen the 10(j) negotiations.
 
 
 8
 On February 15, 1990, FERC entered its order on rehearing, rescinding its declaratory order as to BLM's authority under FLPMA and establishing minimum stream flows requirements as a result of the 10(j) negotiations. The Commission reexamined the language of FLPMA and its legislative history and explained, "[i]t is our revised opinion that BLM has authority under FLPMA to require right-of-way permits for licensed hydropower projects using BLM land." The Commission commented on the conflicting minimum stream flow requirements imposed by BLM and FERC, stating "[i]t appears to us that the denial or conditioning of a right-of-way under FLPMA should not be allowed to be a de facto veto of the Commission's license." FERC did not decide how the conflicts should be resolved, explaining that BLM may have exceeded its authority but that "this is a matter for the courts to decide."
 
 
 9
 Based on the 10(j) negotiations, FERC concluded the minimum flow requirement for the project should be increased from the 5 cfs it had originally imposed to 7 cfs, thereby rejecting the higher flows recommended by Cal Fish and Game and other fish and wildlife agencies. Henwood claimed that FERC's order requiring further 10(j) negotiations should be vacated because: (1) the order improperly altered the license without notice, (2) the order was the result of undue Congressional pressure, and (3) the original 10(j) negotiations were properly conducted and administratively final. FERC rejected those claims.
 
 
 10
 FERC rejected Cal Water's request for rehearing on the water quality certification issue, emphasizing that its interpretive rule regarding waiver was effective upon issuance on February 11, 1987. FERC stated Cal Water's other challenges to the procedures in its rule were improper collateral attacks upon the rulemaking proceeding.
 
 
 11
 On May 21, 1990, FERC issued an order denying rehearing of its February 15, 1990 order. FERC affirmed its rejection of Cal Fish and Game's claim that it had erred in imposing a minimum stream flow of 7 cfs, explaining that it "would permit the project both to have an internal rate of return of 13 percent, and thus allow its development, and to adequately protect aquatic habitat."
 
 
 12
 The Commission also reaffirmed its view that BLM can require Henwood to request a right-of-way under FLPMA, and rejected Henwood's claim that FERC's interpretation of FLPMA was the result of Congressional pressure. FERC again suggested that BLM may have exceeded its authority when it issued a right-of-way permit to Henwood that might prevent construction of the project on economic grounds, but again noted this was "a matter for the courts to decide." Commissioner Trabant again dissented on the bases that the 10(j) negotiations should not have been reopened, and that FLPMA does not apply to hydroelectric licenses. These appeals followed. This court has jurisdiction pursuant to 16 U.S.C. § 825l.
 
 THE MINIMUM STREAM FLOW ISSUE
 
 13
 At the point where Green Creek leaves Dynamo Pond, Henwood proposed installing a pipe to divert water 1.9 miles from Green Creek to its powerhouse. The water is to be returned to the creek below the powerhouse. As previously explained, FERC, in a proceeding in which Cal Fish and Game was not granted party status, adopted year-round minimum stream flows of 5 cfs for the portion of the stream between the point of diversion and the point at which the water returns to the channel (bypass reach). FERC subsequently vacated this aspect of the order and granted Cal Fish and Game party status to allow it to present its claims regarding an appropriate flow regime for the bypass reach.
 
 
 14
 During the proceedings that followed, Cal Fish and Game recommended a minimum stream flow regime ranging from 9 cfs to 15 cfs, depending upon the season. Henwood urged FERC to adhere to its original flow regime of 5 cfs year-round, in order to protect the economic feasibility of the project. As a result of these proceedings, FERC amended its original flow regime to a minimum of 7 cfs year-round.
 
 
 15
 Henwood challenges FERC's decisions to grant Cal Fish and Game Party status out of time and to reopen the negotiations on the appropriate flow regime. Henwood argues that FERC should have adhered to the flow regime established by the Director of OHL, which was initially affirmed by FERC. Cal Fish and Game challenges FERC's rejection of its recommended minimum flows.
 
 
 16
 FERC's Decision to Grant Cal Fish and Game Intervenor Status and to Reopen 10(j) Negotiations
 
 
 17
 Section 10(j)(1) of the FPA, 16 U.S.C. § 803(j), as added by the Electric Consumers Protection Act of 1986 (ECPA), specifies that each project license shall include conditions for the protection, mitigation and enhancement of fish, wildlife and related spawning grounds and habitat, based on recommendations received from various federal and state fish and wildlife agencies. Section 10(j)(2) requires that FERC attempt to reconcile recommendations from a state fish and wildlife agency with the requirements of the FPA. If after such an attempt FERC does not adopt the agency's recommendations, FERC "shall publish findings" explaining (1) that the agency's recommendations are "inconsistent with the purposes and requirements" of the FPA or other laws, and (2) that the conditions selected by FERC protect and mitigate damage to fish and wildlife. 16 U.S.C. § 803(j)(2).
 
 
 18
 Congress did not specify how FERC was to conduct "dispute resolution" under Section 10(j). Henwood argues that FERC's attempt to resolve the stream flow dispute through correspondence and telephone conversations with Cal Fish and Game was adequate under the circumstances and did not justify staying the license and requiring further negotiations. However, Henwood has not demonstrated that the reopening of 10(j) negotiations by FERC was outside of its discretion or the terms of the FPA as amended by ECPA.
 
 
 19
 As a general rule, we show great deference to an administrative agency's interpretation of the law which it is charged with administering. City of Seattle v. FERC, 923 F.2d 713, 715 (9th Cir.1991); Steamboaters v. FERC, 759 F.2d 1382, 1388 (9th Cir.1985). This deference extends to the procedures employed by the agency in implementing the statute. Simpson v. Hegstrom, 873 F.2d 1294, 1297 (9th Cir.1989); Pacific Gas & Elec. Co. v. FERC, 746 F.2d 1383, 1386 (9th Cir.1984). We must reject administrative constructions of a statute that are inconsistent with the statutory mandate or that frustrate the policies Congress sought to implement. Federal Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981).
 
 
 20
 To the extent permitted by law and for good cause, FERC may waive any provision of its rules of practice and procedure or prescribe any alternative procedure. 18 C.F.R. § 385.101(e). In this case, the Commission found that the staff had not properly conducted the 10(j) dispute resolution process in its disagreement with Cal Fish and Game on the issue of project flow requirements.[1] FERC therefore concluded it would be appropriate to waive its regulations in order to grant Cal Fish and Game party status and to reopen the negotiations. FERC argues that this procedural error could not have been harmless because Section 10(j) expressly provides for new procedural mechanisms in order to allow states to more meaningfully participate in the licensing process. We agree. It was within FERC's discretion to reopen the 10(j) proceedings to correct a procedural error, and we reject Henwood's characterization of this procedure as a selective, retroactive application of FERC Order 511 (allowing fish and wildlife agencies to intervene in licensing proceedings within 30 days of a license's order that rejects or materially modifies the agency's 10(j) recommendations).
 
 
 21
 We also reject Henwood's arguments that its license was improperly altered by reopening of the 10(j) negotiations. Contrary to Henwood's claim, Section 6 of the FPA, 16 U.S.C. § 799, which prohibits the unilateral alteration of a license issued by FERC, did not bar FERC from reopening the 10(j) negotiations in this case on rehearing of the initial order granting Henwood a license. Section 6 ensures licenses are free from arbitrary alteration after conclusion of the licensing process, see Pacific Gas & Electric Co. v. FERC, 720 F.2d 78 (D.C.Cir.1983), and does not override Section 313 of the FPA, 16 U.S.C. § 825l, conferring authority on FERC to correct its licensing orders on rehearing and on courts to set aside illegal orders. Furthermore, Section 6 requires all licensees to accept all the terms and conditions of both the FPA and the license issued by the Commission, an event which occurs at the conclusion of the licensing process, and which had not occurred here at the time FERC reopened the negotiations.
 
 
 22
 Nor was FERC's reopening of the 10(j) negotiations violative of the Administrative Procedures Act (APA). Section 558(c) of the APA provides that an agency must give written notice when a license will be withdrawn, suspended, revoked or annulled. Here, the license was not final, so FERC's amendments to the proposed license do not come within Section 558(c). Further, the notice and hearing requirements of Section 558(c) do not apply to FERC's stay of the license in this case, because the requirements conflict with FERC's authority under Section 557 of the APA to order further proceedings on review of staff licensing orders.
 
 
 23
 Under the circumstances, we will defer to FERC's decision to grant Cal Fish and Game intervenor status and to reopen the 10(j) negotiations. This action by FERC was not inconsistent with statutory mandate and advanced, rather than frustrated, Congressional policies evidenced by Section 10(j).
 
 The Flow Regime Adopted by FERC
 
 24
 FERC's Order of February 15, 1990, established a 7 cfs minimum stream flow requirement for the Henwood project. Based on the record in the 10(j) proceedings and FERC analysis, FERC rejected the recommendations of Cal Fish and Game and other fish and wildlife agencies because they conflicted with the requirements of the FPA. Cal Fish and Game argues that by rejecting both its and the United States Fish and Wildlife Service's (USFWS) recommended minimum flows, FERC has failed to give equal consideration to both power production and fish and wildlife protection and enhancement, and relegated fish and wildlife concerns to a secondary purpose of the FPA. We disagree. See United States Dept. of Interior v. FERC, 952 F.2d 538, 544-45 (D.C.Cir.1992).
 
 
 25
 Section 4(e) of the FPA, as amended by ECPA, 16 U.S.C. § 797(e) provides that:
 
 
 26
 In deciding whether to issue any license under this Part for any project, the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.
 
 
 27
 Licenses issued under the FPA shall be on the following conditions:
 
 
 28
 That the project adopted, ... shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water power development, for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes referred to in section 4(e)....
 
 
 29
 Section 10(a)(1) of the FPA, 16 U.S.C. § 803.
 
 
 30
 Upon reexamination of the flow regime, FERC determined that habitat losses that would occur under the 5 cfs flow regime were greater than had been predicted in the Director's licensing order. After lengthy analysis and consideration of additional supplemental information, FERC issued its order of February 15, 1990, imposing a 7 cfs water release on the project. FERC's reexamination led it to conclude that a 7 cfs minimum flow would significantly improve both juvenile and adult habitat for brown and rainbow trout, and would increase adult habitat for brown trout by 14 percent and for rainbow trout by 13 percent. FERC explained that:
 
 
 31
 Compared to existing conditions, fry habitat for both species at a 7-cfs flow would generally be protected, with increases over existing conditions in most months, and only slight decreases in others. Habitat for both brown trout and rainbow trout juveniles would generally be protected at close to current levels. The amount of habitat for brown trout juveniles would be less than 10 percent below existing levels except in September (14 percent reduction). Over 96 percent of existing juvenile rainbow trout habitat would be protected with a 7-cfs bypass flow. Habitat for brown trout adults would be protected at 74 percent to 93 percent of existing levels during the period from September through April. Adult rainbow trout habitat would be protected at 68 percent to 93 percent of existing levels during the same period.
 
 
 32
 FERC found that imposition of Cal Fish and Game's flow regime would foreclose construction of the project, as these flows would result in an economically unattractive internal rate of return of 10.2 percent. FERC found that if the minimum flows were raised to 7 cfs, the project would have a return rate of 13 percent and would in all likelihood still be built.
 
 
 33
 FERC considered recreational values and found that "[t]here is no way to directly compare the recreational value of the existing pond to a condition without the pond and subsequent reversion to stream habitat." Although FERC found it could not quantify the recreational benefits associated with the project, it considered that:
 
 
 34
 The apparent preference of fishermen and other recreationists for the pond area conflicts with Cal Fish and Game's negative views on preservation of the pond at the expense of stream habitat. Also, if the project is not built, access to the area of the pond by the public could become restricted, because the pond is on private lands.
 
 
 35
 Construction of the project would ensure preservation of Dynamo Pond for recreational use and ensure public access. Failure to construct the project will likely result in loss of the pond, and potentially limited access to the pond area.
 
 
 36
 Review of FERC decisions is limited. Steamboaters, 759 F.2d at 1388. We examine only whether the decision was arbitrary, capricious, an abuse of discretion, or not in accordance with law. Id. (citations omitted). We generally apply the substantial evidence standard when reviewing an agency's factual findings. NLRB v. Howard Elec. Co., 873 F.2d 1287, 1290 (9th Cir.1989).
 
 
 37
 The FERC decision demonstrates that the Commission properly weighed the evidence and balanced the beneficial public purposes specified in Sections 4(e) and 10 of the FPA. While ECPA establishes a presumption that conditions recommended by fish and wildlife agencies should be included in a license, FERC has the obligation to balance environmental concerns with the need for power development, and, when necessary, to demonstrate why conditions proposed by fish and wildlife agencies should not be included in a license. FERC has met its obligation in this case, and has not acted arbitrarily or capriciously.
 
 
 38
 Section 10 of the FPA grants FERC broad authority to weigh the salient factors at issue in granting a license and to impose appropriate conditions on hydroelectric licenses. FERC's "broad and paramount" role in establishing licensing conditions for a hydroelectric project was refined and reaffirmed in ECPA. See California v. FERC, 495 U.S. 490, 500, 110 S.Ct. 2024, 2030, 109 L.Ed.2d 474 (1990).
 
 
 39
 During consideration of the conference report on the FPA amendments relevant to this discussion, Senator Johnston, an author of ECPA, explained:
 
 
 40
 [W]e did accept the House fish and wildlife provision, but only after a small but crucial amendment. That was the substitution of the phrase "equitable consideration" for "equitable treatment" in amended section 4(e) of the Federal Power Act. By doing this we made it clear that FERC must consider fish and wildlife needs equally with the development purposes for which the licenses are issued. However, the amendment to section 4(e) also makes clear that while full and genuine consideration of fish and wildlife is required, equal treatment is not. Instead, the reconciliation of power and other development needs with fish and wildlife needs in cases of conflict is ultimately left to the public interest judgment of the Federal Energy Regulatory Commission.
 
 
 41
 132 Cong.Rec. S. 15107 (emphasis added).
 
 
 42
 "Equal consideration" is not the same as "equal treatment," and equal consideration does not dictate FERC's acceptance of the result proposed by the fish and wildlife agencies. FERC must balance the public interest in all of its stated dimensions, give equal consideration to conflicting interests, and reach a reasoned factual decision. We conclude that FERC has met its task.
 
 
 43
 Cal Fish and Game argues that the FPA has never been a guarantee to a developer that a particular project would be profitable. However, we disagree that consideration of the Henwood project's "economic feasibility" constituted an unlawful preference for power and development purposes. FERC engaged in proper balancing of the relevant factors and met its burden of demonstrating why the conditions recommended by Cal Fish and Game should not be included in the license. We cannot say in this case that FERC gave inadequate consideration or too little weight to fish, wildlife and recreational factors.[2]
 
 
 44
 Cal Fish and Game also argues that there is no substantial evidence to support the conclusion that 7 cfs will support the reduced trout habitat because of FERC staff error in analysis, which relies on monthly flow averages to assess trout habitat and ignores minimum flows and flows below average during each month, and does not analyze the impact of drought years. FERC explains that it decided its mean-flow analysis was based on the "best available evidence" because it provided information on habitat over the course of the licensing period with fluctuations in flow above and below the mean.
 
 
 45
 Given our review of the record, we cannot say that the FERC decision increasing the flow from 5 cfs to 7 cfs and rejecting higher flows was without substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). While Cal Fish and Game might be able to argue that its methodology is "better," it has not demonstrated, nor does a review of the lengthy FERC analysis of flow regimes reveal, that FERC used an invalid methodology, or that FERC's decision was not based on substantial evidence. FERC used a new Instream Flow Incremental Methodology (IFIM) analysis of flow effects on habitat, provided by the United States Fish and Wildlife Service (USFWS), to analyze data on all three reaches of the IFIM study area. FERC then analyzed the impacts of the various flow scenarios by computer, using the input data and habitat preference criteria prepared by USFWS. Substantial evidence supports FERC's stream flow requirements and its decision to set a 7 cfs requirement will not be disturbed.
 
 ALLEGATIONS OF UNDUE CONGRESSIONAL INFLUENCE
 
 46
 Henwood argues that the entire sequence of FERC orders was tainted by the appearance of improper Congressional influence in violation of Henwood's due process rights. Henwood points to the "lengthy correspondence" between FERC and Chairman John Dingell of the House Energy and Commerce Committee during the fall and winter of 1988 about the Dynamo Pond license and the Section 10(j) procedures followed in that case. Henwood also complains that the FERC reversal on the FLPMA issue (discussed below), was the result of FERC's receiving direction from Chairman Dingell to implement a July, 1989, General Accounting Office (GAO) report that disagreed with FERC's interpretation.
 
 
 47
 Henwood relies on Pillsbury Co. v. FTC, 354 F.2d 952 (5th Cir.1966) in arguing that the FERC orders should be set aside because of the taint of undue Congressional influence and the loss of the appearance of impartiality in this case. In Pillsbury, the Fifth Circuit vacated and remanded a Federal Trade Commission (FTC) antitrust decision requiring divestiture of a competitor by Pillsbury Company. The court held that prolonged and hostile questioning by congressional subcommittees of two of four commissioners who participated in the final agency decision deprived Pillsbury of procedural due process, where the thrust of the questions challenged the correctness of the FTC's approach in that case. Id. at 963-64. The Fifth Circuit explained that the investigation focused "directly and substantially upon the mental decisional processes of a Commission" in a case pending before it, subjecting "an administrator to a searching examination of how and why he reached his decision." Id. at 964.
 
 
 48
 Henwood urges that while Chairman Dingell introduced no new evidence, nor did he inquire into the mental processes of FERC, because the licensing of the Dynamo Pond project was a quasi-judicial proceeding, FERC's decision can be invalidated by the appearance of bias or pressure. Henwood reads Pillsbury too broadly, and its Pillsbury claims have no merit.
 
 
 49
 Chairman Dingell's three letters to FERC complaining about the 10(j) procedures FERC had initially followed in this case do not rise to the level of undue congressional influence described in Pillsbury, nor do they adversely affect the appearance of impartiality in this case. FERC's decision to correct a procedural problem was based on its own independent analysis of the record in this proceeding, and was an effort to establish fair procedures to allow the parties and the commission to investigate. The ECPA amendments to the FPA were recent, and both Chairman Dingell and the Commission were understandably concerned about getting off to a good start with 10(j) dispute resolution efforts.
 
 
 50
 Nor do we find the two letters from Chairman Dingell that urged FERC to weigh the view of the legislative history of FLPMA presented by a report of the GAO to constitute the type of undue congressional influence that would mandate reversal of the final FERC order on this issue based upon Pillsbury. FERC gave a reasoned explanation for the reversal of its original interpretation of FLPMA, and this provides substance for its claim that it addressed and resolved the right-of-way issue under its own independent and detailed analysis of the issue. While we hold the Commission erred in its ruling on the FLPMA issue, the record does not disclose that its decision was the result of undue congressional influence. In short, Chairman Dingell's letters, expressing his views on the 10(j) and FLPMA issues, do not constitute the type of intense and undue congressional influence that was present in Pillsbury.
 
 
 51
 Henwood also argues that FERC violated its rules on ex parte communications and the APA in the conduct of its correspondence with members of Congress on the implementation of Section 10(j) and the interpretation of FLPMA. Henwood has not demonstrated that any of the communications from members of Congress were ex parte communications that could invalidate the FERC orders, or that any such communication unduly influenced the merits of the FERC decision. We therefore reject this alleged violation of ex parte rules or the APA as a basis for invalidating the FERC orders.
 
 THE WATER QUALITY CERTIFICATION ISSUE
 
 52
 Section 401(a)(1) of the Clean Water Act, 33 U.S.C. § 1341(a)(1)(CWA), prohibits FERC from issuing a license for construction or operation of a hydroelectric project unless water quality certification for the project has been issued by the state certifying agency. In this case, the certifying agency is the State of California. However, Section 401(a)(1) explicitly permits authorization of discharge without certification if the certifying agency has failed to act on the applicant's request for a section 401 certificate within a reasonable period of time, not to exceed one year, from the date the certifying agency received the request for certification. In that event, Section 401 is deemed waived by the certifying agency.
 
 
 53
 Up until August, 1985, FERC's practice had been to deem the one-year waiver period to commence when the certifying agency found the request acceptable for processing. On August 9, 1985, FERC issued a Notice of Proposed Rulemaking to reexamine its procedures for determining when a CWA 401 certification is deemed waived by a certifying agency. The concern was with the ability of states to delay indefinitely their acceptance of a certification request.
 
 
 54
 Henwood requested certification from Cal Water on August 28, 1985. The record does not reveal when, if ever, Cal Water accepted this request for processing.
 
 
 55
 Following notice and the receipt of comments from 29 entities, including Cal Water Board, FERC issued Order No. 464 on February 11, 1987, promulgating a new rule regarding CWA certification waiver. The one-year period for waiver would commence on the date the certifying agency received the certification request. The rulemaking order stated the rule had a retroactive effect because it applied to all pending applications, and noted the rule would become effective on May 11, 1987.[3] The Director of OHL sent Cal Water a letter listing the Henwood project as one for which certification had been waived and offered Cal Water the opportunity to recommend conditions for possible inclusion in the license. Cal Water did not seek to have conditions included in the license, and instead filed a request for rehearing of FERC's February 11, 1987 order, some 87 days late. FERC did not act on Cal Water's untimely rehearing request. Cal Water appealed to this court, and its appeal was dismissed for lack of jurisdiction pursuant to Section 313 of the FPA, 16 U.S.C. 825l. Meanwhile, Cal Water had denied Henwood certification on April 30, 1987.[4]
 
 
 56
 On December 23, 1987, FERC staff issued a license to Henwood that stated water quality certification requirements had been waived by Cal Water. Cal Water's request for rehearing/reconsideration was treated as an appeal of FERC's licensing order and denied. FERC found that the new waiver rule in Order No. 464 applied as of its issuance date of February 11, 1987, and that Cal Water's denial of certification was ineffectual because it took place more than one year after certification was requested by Henwood. On March 18, 1988, Cal Water filed another request for rehearing and FERC denied this request in its February 15, 1990 order.
 
 
 57
 Cal Water argues that by its own terms Order No. 464 was not effective until May 11, 1987, and therefore Cal Water's denial of water quality certification for the Henwood project on April 30, 1987 was timely. Cal Water also argues that if the waiver rule was immediately effective upon the order's issuance date, FERC's decision to apply it immediately without the required notice, comment and publication was arbitrary, capricious and violative of the Administrative Procedures Act.
 
 
 58
 Cal Water also argues that its petition is not a collateral attack on Order No. 464, but a challenge to the application of the new waiver rule on the date of issuance, rather than on the "effective date" of May 11, 1987. Finally, Cal Water argues the offer to add water quality condition recommendations to be considered in the FERC license was an inadequate substitute for allowing it until May 11, 1987, to take action on the certification.
 
 
 59
 Even if Cal Water's claim is not considered an impermissible collateral attack on the 1987 rulemaking, its substantive challenges to the rule do not demonstrate that FERC acted arbitrarily and capriciously in denying Cal Water's request for rehearing. While Cal Water argues that it had a window of time in which to deny certification before the effective date of May 11, 1987, the wording of Order No. 464 reasonably suggests otherwise. Order No. 464 showed FERC's intent to apply the new waiver rule immediately and retroactively to pending license applications such as Henwood's. See p. 1553, n. 3, supra. Furthermore, the rulemaking was fully consistent with the letter and intent of 401(a)(1) of the CWA, which states that "if a state ... fails or refuses to act on a request for certification within a reasonable period of time (which shall not exceed one year) after receipt of such request the certification requirements of this subsection shall be waived with respect to such Federal action."
 
 
 60
 FERC did not violate the comment procedures of the APA, as the publication provision was inapplicable to the rule involved here because it was an interpretive rule that simply applied the one-year limitation set forth in the CWA. See 5 U.S.C. § 553(b)(3)(A). An "interpretive rule" describes an agency's view of an existing statute or regulation. Batterton v. Marshall, 648 F.2d 694, 702 n. 34 (D.C.Cir.1980) (citations omitted); see also Linoz v. Heckler, 800 F.2d 871, 877 (9th Cir.1986). While the "interpretive rule" label may be fuzzy, see Batterton, 648 F.2d at 702-03, the fact that FERC's interpretation may have "substantial impact" does not automatically transform it into a legislative rule.
 
 
 61
 Contrary to Cal Water's argument, immediate retroactive application of the new waiver rule did not completely foreclose its authority to choose an alternative to waiver of Henwood's water quality certification. Cal Water took no action on the Director of OHL's offer to include recommendations from Cal Water in the FERC license. This undercuts Cal Water's argument that applying the new waiver rule to pending applications as of February 11, 1987 would result in manifest injustice. FERC did not act arbitrarily or capriciously in denying Cal Water's petition for rehearing on the water quality certification issue on the basis that Cal Water waived certification pursuant to Section 401(a) of the CWA.
 
 
 62
 THE FEDERAL LAND POLICY AND MANAGEMENT ACT ISSUE
 
 
 63
 The Federal Water Power Act of 1920 (41 Stat. 1063), broadened into the Federal Power Act in 1935 (49 Stat. 847), followed years of frustration in trying to arrive at a mechanism for the development of the country's hydropower resources. The requirements of Congressional authorization of each project, together with uncertainty of the tenure that would be enjoyed by the developer, resulted in a minimum of successful efforts to develop hydropower as a source of electric power. The report of the House Committee on Water Power reviews the history of Congressional efforts dating back to President Theodore Roosevelt's vetoes of bills authorizing specific projects. It quotes from a report by Secretary of Agriculture Houston:
 
 
 64
 [The bill] provides that the administration of water powers within Federal jurisdiction, which have hitherto been handled independently by three separate departments, shall be coordinated, through a commission composed of the heads of these departments, in order that duplication of work may be avoided, that a common policy may be pursued, and that the combined efforts of the three agencies may be directed toward a constructive national program of intelligent, economical utilization of our power resources.
 
 
 65
 H.R.REP. NO. 61, 66th Cong., 1st Sess., at 5 (1919). The executive branch recognized the exclusive authority of the Federal Power Commission very soon after the FWPA's enactment.[5]
 
 
 66
 The Public Utility Act of 1935 amended the Federal Water Power Act (FWPA) by adding parts II and III and changing its name to the Federal Power Act (FPA). More will be said about this later. It also amended part I (the original FWPA) in certain particulars not germane to this discussion. The Senate Report on the FPA contains language which reflects Congress' view of the breadth of FPC jurisdiction over water power projects:
 
 
 67
 Two amendments are made to section 7 [of the FWPA] merely for the purpose of clarifying the broad objective of the act to secure [Federal Power] Commission control over all projects involving the development of the Nation's water resources.
 
 
 68
 S.REP. NO. 621, 74th Cong., 1st Session, at 44 (1935).
 
 
 69
 In 1946, the Supreme Court rejected a challenge by the State of Iowa to the FPC's exclusive licensing authority. In doing so, the Court said:
 
 
 70
 The inappropriateness of such interpretation is apparent in the light of the circumstances which culminated in the passage of the Federal Water Power Act in 1920. The purposes of the Act were then so generally known as to have made such a restrictive interpretation impossible and a denial of it unnecessary. It was the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so, instead of the piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted.
 
 
 71
 It was a major undertaking involving a major change of national policy. [Footnote omitted.] That it was the intention of Congress to secure a comprehensive development of national resources and not merely to prevent obstructions to navigation is apparent from the provisions of the Act, the statutory scheme of which has been several times reviewed and approved by the courts.
 
 
 72
 First Iowa Hydro-Elec. Coop. v. Federal Power Comm'n, 328 U.S. 152, 179-81, 66 S.Ct. 906, 919, 90 L.Ed. 1143 (1946).
 
 
 73
 There can be little doubt that the Federal Power Commission, now the Federal Energy Regulatory Commission, was the federal agency exclusively empowered to authorize hydroelectric projects, at least until passage of the Federal Land Policy and Management Act (FLPMA) in 1976. 90 Stat. 2743.
 
 
 74
 Prior to the passage of FLPMA, the Bureau of Land Management and its predecessor agencies within the Department of the Interior had no general statutory guidance for the management of lands within their jurisdiction. FLPMA, also referred to as the BLM Organic Act, addressed this lack of a comprehensive statutory mandate and also reflected the growing national concern for preservation of national lands rather than their disposal. In discussion on the Senate floor during consideration of the bill in 1976, Senator Haskell submitted an excerpt from the committee report on Senate Bill 507, which, as amended, became FLPMA. That report stated:
 
 
 75
 The purpose of S. 507, ... is to provide the first comprehensive, statutory statement of purposes, goals, and authority for the use and management of about 448 million acres of federally-owned lands administered by the Secretary of the Interior through the Bureau of Land Management.
 
 
 76
 ....
 
 
 77
 ... In comparison with the organic acts of the other Federal land management agencies, these laws are often conflicting, on occasion truly contradictory, and, to a serious extent, incomplete and inadequate. S. 507, as ordered reported, would consolidate these laws, remove conflicts, and provide missing authority.[6]
 
 
 78
 As finally adopted, FLPMA defined "public lands" as follows:
 
 
 79
 The term "public lands" means any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership, ...
 
 
 80
 43 U.S.C. § 1702(e).
 
 
 81
 The Secretary's authority to issue rights-of-way over the public lands for projects related to electricity is found in Section 501(a) as follows:
 
 
 82
 The Secretary, with respect to the public lands and, the Secretary of Agriculture, with respect to lands within the National Forest System (except in each case land designated as wilderness), are authorized to grant, issue, or renew rights-of-way over, upon, under, or through such lands for--
 
 
 83
 ....
 
 
 84
 (4) systems for generation, transmission, and distribution of electric energy, except that the applicant shall also comply with all applicable requirements of the Federal Power Commission under the Federal Power Act of 1935 (49 Stat. 847; 16 U.S.C. 791).
 
 
 85
 43 U.S.C. § 1761(a)(4).
 
 
 86
 Soon after enactment of FLPMA, the argument was made before FERC that rights-of-way under FLPMA were required for FERC licensed projects. The Commission flatly and unequivocally rejected the contention, saying:
 
 
 87
 It is clear that the Federal Water Power Act since 1920, and Part I of the Federal Power Act since 1935, have given Commission licensees authority to occupy and utilize government non-Indian lands for the purpose of constructing, operating and maintaining licensed project works. It is equally clear that the Commission's authority to authorize the use, occupancy and enjoyment of such lands in conjunction with licensed water power projects has been exclusive and, therefore, it has not been necessary to include conditions in licenses requiring Commission licensees to obtain similar authority for such lands from the Secretaries of Agriculture or of the Interior.
 
 
 88
 Sections 705 and 706 of the Land Policy Act repeal numerous laws relating to the administration of public lands and to rights-of-way, but the Federal Power Act is not listed among those laws. Indeed, the savings provision of the Land Policy Act (43 U.S.C. § 1701, note, § 701(f)) expressly provides that "Nothing in this Act shall be deemed to repeal any existing law by implication." And it also provides (43 U.S.C. § 1701, note, § 701(g)) that Nothing in this Act shall be construed--
 
 
 89
 (4) as superseding, modifying, or repealing, except as specifically set forth in this Act, existing law applicable to the various Federal agencies which are authorized to develop or participate in the development of water resources or to exercise licensing or regulatory functions in relation thereto.
 
 
 90
 It has always been understood that the principle purpose of the Federal Water Power Act of 1920 was to establish a national policy to promote the comprehensive development of water power on government lands and navigable waters other than by the government itself, and that such policy would be administered by abolishing the piecemeal authorities of the Secretaries of the Interior, Agriculture and War over the nation's hydro-electric resources and centralizing them in the Federal Power Commission. [Footnote omitted.]
 
 
 91
 It is inconceivable that in 1976 Congress, sub silentio, reimposed a duplicate system of federal authority over water power development. 43 U.S.C. § 1761(a)(4), which requires rights-of-way permittees of the Secretaries of Agriculture and the Interior to "also comply with all applicable requirements of the Federal Power Commission under the Federal Power Act of 1935" [Emphasis added], should be construed as being limited to Part II of the Federal Power Act which was newly enacted in 1935.
 
 
 92
 Escondido Mutual Water Company, 9 FERC 61,241, at 61,519-520 (1979), rev'd on other grounds, 692 F.2d 1223 (9th Cir.1982), reh'g denied, 701 F.2d 826 (1983), rev'd in part, 466 U.S. 765, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984).
 
 
 93
 The Commission reaffirmed its position in several later cases (Camille E. Held, et al., 42 FERC 61,032, at 62,219 (1988); Thermalito Irr. Dist., et al., 39 FERC 61,270 at 62,883 (1987)), including twice in this one. (Order of July 18, 1988; Order of May 2, 1989.) In a third decision in this case, however, in 1990 the Commission reversed itself and held that the BLM had authority pursuant to FLPMA to issue permits for use of federal lands involved in hydro-electric projects licensed by the Commission. (50 FERC p 61,183 (1990).) It is therefore necessary to visit this issue in this appeal.
 
 
 94
 This court has previously interpreted the meaning of "public lands" as that term is used in FLPMA. In the case of Columbia Basin Land Protection Ass'n v. Schlesinger, 643 F.2d 585 (9th Cir.1981), landowners had filed suit against the Bonneville Power Administration seeking to enjoin the construction of a high voltage power transmission line over their lands. Among other issues raised on appeal, the landowners contended that since the United States had retained the mineral rights in their property over which the transmission line was to be constructed, those lands came within the terms of the definition of "public lands" in FLPMA and therefore a BLM right-of-way was required.
 
 
 95
 In Columbia Basin, this court held that "public lands" was used in its traditional sense by Congress when it enacted FLPMA and therefore "public lands" meant those "subject to sale or other disposal under general laws." The court noted the conference committee report on S. 507 stated that the conferees had decided that the statute would retain the traditional use of the term "public lands." The court went on to say: "The United States Supreme Court has consistently held that 'public lands' means lands which are subject to 'sale or other disposal under general laws,' ... and does not include '[a]ll land, to which any claims or rights of others have attached.' " 643 F.2d at 602 (citations omitted). The specific holding in that case was that the retention of mineral rights by the United States did not mean that the land to be traversed by the powerline was public land within the meaning of FLPMA.
 
 
 96
 It is argued here that the Columbia Basin case is factually distinguishable from the issue here because it did not involve subsection (4) of FLPMA Section 501, as it relates to the authority of FERC, since the transmission line at issue there was not a primary project line licensed by FERC. This contention does not take into account the structure of Section 501. The authority of the Secretary of the Interior to grant rights-of-way under that section extends only to the "public lands". Subsection (4) specifically provides authority for the issuance of rights-of-way over the public lands for the particular functions mentioned there. Unless a right-of-way for an electrical project as defined in that subsection is sought over the public lands, Section 501(a) provides no authority to the Secretary of the Interior to issue a right-of-way. Therefore, the holding in Columbia Basin does control on the interpretation of the term "public lands" as used in FLPMA.
 
 
 97
 Section 24 of the FWPA (16 U.S.C. § 818) provided that "any lands of the United States included in any proposed project under this [Part] shall from the date of filing of application therefor be reserved from entry, location, or other disposal under the laws of the United States...." While that section was amended in some particulars later, it was and is clear that United States lands included within the boundaries of FERC projects are reserved from entry as of the date of the filing of the application with the Commission. As the Commission said in its first ruling on Henwood's motion for declaratory order:
 
 
 98
 According to the United States Supreme Court, under the comprehensive licensing scheme of Part 1 of the FPA "the Commission is plainly made the guardian of the public domain," FPC v. Idaho Power Co., 344 U.S. 17, 23 [73 S.Ct. 85, 88, 97 L.Ed. 15] (1952), and the authorization of hydroelectric projects using public lands of the United States "is within the exclusive jurisdiction of" the Commission. FPC v. Oregon, 349 U.S. 435, 445-46 [75 S.Ct. 832, 838-39, 99 L.Ed. 1215] (1955).
 
 
 99
 44 FERC p 61,076 at 61,213 (1988).
 
 
 100
 BLM also argues that the Mining Claims Rights Restoration Act of 1955 makes all lands which are subject to FPA withdrawal "public lands," for purposes of FLPMA. The section of the Mining Claims Restoration Act relied on by BLM provides, in pertinent part:
 
 
 101
 All public lands belonging to the United States heretofore, now or hereafter withdrawn or reserved for power development or power sites shall be open to entry for location ... of mining claims....
 
 
 102
 30 U.S.C. § 621.
 
 
 103
 BLM's convoluted argument does not explain how a mining law which narrows the scope of the reservation from entry under the FPA operates to convert all lands reserved under the terms of the FPA back to "public lands" for all purposes. Moreover, BLM's argument also makes no sense as it would be applied to lands included in applications for license under Part I of the FPA.
 
 
 104
 The proviso following the above quoted portion of Section 621 excludes application of the Act to operating projects or projects under construction, and to projects under examination and survey by a prospective licensee holding a preliminary permit from FERC. Under BLM's view, apparently the land reserved from entry under the terms of the FPA remains "public lands" for all purposes pursuant to the Restoration Act after the application to FERC, in spite of the language of Section 24 (16 U.S.C. § 818), until survey and examination starts under a preliminary permit, at which time it becomes reserved. When the survey is over, it once again becomes public lands and stays in that status until construction begins, when it is again reserved from entry. This interpretation of the effect of the Restoration Act is unsupportable on its face, and is not required to give full effect to the terms of both the Restoration Act and the FPA. Congress' passage of the Restoration Act did no more than limit the scope of a withdrawal under the FPA, to permit entry for mining claim location in certain circumstances.
 
 
 105
 The specific terms of subsection (4) refute the further contention of BLM and the conservation groups that Congress specifically provided a system of dual authority by requiring that the applicant "also comply with all applicable requirements of the Federal Power Commission under the Federal Power Act of 1949 (49 Stat. 847; 16 U.S.C. § 791)."
 
 
 106
 The forerunner of Section 501 of FLPMA in S. 507, as originally introduced, was Section 401, which provided in pertinent part:
 
 
 107
 Section 401. Authorization to Grant Rights-of-Way.--(a) The Secretary is authorized to grant, issue, or renew rights-of-way over, upon, or though the national resource lands for--
 
 
 108
 ....
 
 
 109
 (4) Systems for generation, transmission, and distribution of electric energy, except that the applicant shall also comply with all applicable requirements of the Federal Power Commission under the Act of June 10, 1920, as amended (16 U.S.C. § 796, 797).
 
 
 110
 Legislative History of FLPMA, at 194.
 
 
 111
 H.R. 13777 was the House counterpart to S. 507. Section 501 of that bill provided right-of-way authority very comparable to what is now found in Section 501, except that it required compliance with applicable requirements of the Federal Power Commission under "the Federal Power Act of 1935 (16 U.S.C. § 791)." The House amended S. 507 by inserting the provisions of H.R. 13777, and the amendments went to conference. Committee staff prepared recommendations for use of the conference committee, which incorporated the provisions of H.R. 13777. (Legislative History of FLPMA, at 832.) The bill, as reported by the conference committee, was enacted with the language now found in Section 501(a)(4). The noteworthy change in conference was the addition of "49 Stat. 847." This specific reference is to the commencement of Part II of the Federal Power Act of 1935. This requires us to examine more closely the structure of that Act.
 
 
 112
 The general purposes of the Public Utility Act of 1935, which included what is now known as the Federal Power Act of 1935, were stated in the Senate Report:
 
 
 113
 The Committee on Interstate Commerce, to whom was referred the bill (S. 2796) to provide (in title I) for the control and elimination of public-utility holding companies operating, or marketing securities, in interstate and foreign commerce and through the mails, and to provide (in title II) for the regulation of the transmission and sale of electric energy in interstate commerce, for the amendment of the Federal Water Power Act, and for other purposes....
 
 
 114
 S.REP. NO. 621, 74th Cong., 1st Sess. 1 (1935).
 
 
 115
 The report went on to describe the general purposes of title II as follows:
 
 
 116
 Title II of the bill repeals two sections and amends certain other sections of the present Federal Water Power Act, and the present act, as thus modified, is designated part 1. Two new parts are then added. Part 2 contains substantive provisions for the regulation of electric energy in interstate commerce. Part 3 contains procedural and administrative provisions applicable to the regulation of licensees under part 1 and interstate public utilities under part 2.
 
 
 117
 S.REP. NO. 621, 74th Cong., 1st Sess. 17 (1935) (emphasis supplied).
 
 
 118
 Part II, which is at issue here, is more fully described in the portion of the report describing Section 201.
 
 
 119
 The subsection declares that the business of generating, transmitting, and selling electric energy for ultimate public distribution is affected with a public interest and that Federal regulation of the transmission and sale of energy in interstate commerce and the generation of energy for such transmission and sale is necessary in the public interest....
 
 
 120
 ... Jurisdiction is asserted also over all interstate transmission lines whether or not there is sale of the energy carried by those lines and over the generating facilities which produce energy for interstate transmission and sale. It is obvious that no steps can be taken to secure the planned coordination of this industry on a regional scale unless all of the facilities, other than those used solely for retail distribution, are made subject to the jurisdiction of the Commission.
 
 
 121
 S.REP. No. 621, 74th Cong., 1st Sess. 48 (1935) (emphasis supplied).
 
 
 122
 Part II of the Federal Power Act of 1935 had relation solely to extension of Commission jurisdiction over activities of public utilities engaged in interstate transmission of electric energy, whether or not such energy was generated from hydropower sources. Given the history of how the specific reference to Part II of the Federal Power Act came to be included in Section 501(a)(4), it is apparent that the reference to Part II was not accidental. If the reference had remained limited to 16 U.S.C. § 791, as staff recommended, the subsection would have referred specifically to the entirety of FPA, which commences at Section 791a. The statutory citation of Part II of the Federal Power Act, instead of the Act generally, or of Part I, makes it clear that licensing activities of the Federal Energy Regulatory Commission under Part I of the Federal Power Act were not to be affected by the reference in Section 501(a)(4) of FLPMA.
 
 
 123
 In 1986, Part I of the Federal Power Act was substantially amended for the first time since the adoption of the Federal Water Power Act of 1920, by an act designated the Electric Consumers Protection Act of 1986 (ECPA). (Act of October 16, 1986, public law 99-495, 100 Stat. 1243.) Congress accomplished a number of things in ECPA, most of which are not germane to our discussion here. We have already seen how fish and wildlife agencies were empowered to recommend conditions to be imposed on project operations which only could be discounted by FERC upon the making of specific findings. The Commission was commanded to give equal consideration to energy conservation, protection, mitigation and enhancement of fish and wildlife, protection of recreational opportunities, and the preservation of other aspects of environmental quality. 16 U.S.C. § 797(e), as amended.
 
 
 124
 Conspicuously absent from the legislative history of ECPA is any discussion of the relationship between the new authority given the fish and wildlife agencies and any parallel authority in the Secretary of the Interior already existing under FLPMA. Such absence is even more marked when it is remembered that the USFWS is one of the agencies given authority to recommend conditions to FERC which can only be discounted by the Commission after specific findings, as discussed above. Presumably, the Secretary's right-of-way decisions under FLPMA would follow review by USFWS, which would have no less access to the Secretary in that process than it has to FERC under ECPA. While the USFWS is entitled to comment on proposed FERC project license conditions whether or not lands administered by BLM are included within the project, one would expect that the relationship between the authority now claimed by the BLM and the authority given to the USFWS under ECPA would have at least been mentioned in the extensive Congressional record generated by consideration and passage of ECPA.
 
 
 125
 BLM claims that its interpretation of FLPMA is entitled to deference, citing several Supreme Court cases.[7] However, in Chevron USA v. NRDC, the Court said that the judiciary is the final arbiter of issues of statutory construction. If use of traditional tools of statutory construction discloses that Congress had a clear intent, then "that intention is the law and must be given effect." 467 U.S. at 843, n. 9, 104 S.Ct. at 2782, n. 9. The meaning of "public lands" is clear as the above analysis and Columbia Basin point out. BLM has not pointed to any history which would indicate that Section 501(a)(4) was not limited to "public lands."[8]
 
 
 126
 Given the creation of the FWPA and the FPC in response to a perceived national need for unified administrative authority over hydropower licensing, and the reaffirmation of that policy in later years, we would not lightly imply a repeal of the exclusive nature of FERC's authority over the conditions of use of federal lands for hydropower projects. The Supreme Court, in a similar setting, refused to find congressional intent which would create an unreasonable result:
 
 
 127
 We cannot ascribe to Congress a purpose of subjecting the concessionaire to these two separate masters, who show at the outset their inability to agree by their presence on the opposite sides of this lawsuit.
 
 
 128
 Universal Interpretive Shuttle Corp. v. Wash. Metropolitan Area Transit Comm'n, 393 U.S. 186, 191, 89 S.Ct. 354, 357, 21 L.Ed.2d 334 (1968).
 
 
 129
 The prospective FERC licensee, like the shuttle operator in Universal, must dance to two fiddlers, according to BLM. One, FERC, has a long hydroelectric licensing history, with printed decisions comprising many volumes, with the respective roles of state, federal and Indian parties carefully spelled out in the statute. The other, BLM, has no licensing history, no hydro expertise, no statutory guidance on the participation of the same parties who will appear at FERC. This, we conclude, is an unreasonable result, and not one to be ascribed to Congress in the course of interpreting FLPMA.[9]
 
 
 130
 When the text and histories of the Federal Water Power Act of 1920, the Federal Power Act of 1935, the Federal Land Policy and Management Act of 1976 and the Electric Consumers Protection Act of 1986 are evaluated, it becomes clear that the exclusive jurisdiction of FERC over federal hydro-electric development first created in 1920 was reinforced in 1935 and remains unimpaired by the terms or any necessary inference of the Federal Land Policy and Management Act of 1976. Therefore, the Commission was in error when it held that BLM had authority to issue permits for Henwood's project. BLM right-of-way authority under FLPMA extends to non-hydro sources of generation, such as thermal, solar and wind, and to transmission facilities not licensed as part of a hydro project facility by FERC.
 
 THE COMMISSION'S MOTION TO DISMISS
 
 131
 FERC moved to dismiss the petitions for review of the FLPMA issue when briefing was almost complete, on the basis that the petitioners are not aggrieved by the Commission's order as required by 16 U.S.C. § 825l and the issues were not "ripe" for review. All petitioners contest the motion, arguing that this court can, and should, decide the FLPMA issue. We agree.
 
 
 132
 When the Commission reversed itself and held that the BLM had authority under FLPMA to issue right-of-way permits, it said:
 
 
 133
 ... Congress empowered the Commission to make a determination on a license application with respect to all aspects of the public interest. See Udall v. Federal Power Comm'n, 387 U.S. 428, 450, 87 S.Ct. 1712, 1724, 18 L.Ed.2d 869 (1967).
 
 
 134
 It appears to us that the denial or conditioning of a right-of-way under FLPMA should not be allowed to be a de facto veto of the Commission's license. Indeed, it may well be that BLM has exceeded its authority under FLPMA in imposing conditions in the grant of the right-of-way. However, we recognize that this is a matter for the courts to decide.
 
 
 135
 50 FERC at p 61,183 at 61,556 (1990).
 
 
 136
 The Commission reaffirmed its position in denying the rehearing. 51 FERC p 61,196 at 61,558 (1990).
 
 
 137
 First, it is proper to note that if any of the petitioners are "aggrieved," and the issues presented by the petition are "ripe" for review, the other petitioners, as parties before FERC, could appear here to argue the merits of the petition. Thus, we need not address the status of each petitioner separately if one petitioner is properly before the court on the FLPMA issue.
 
 
 138
 In Steamboaters v. FERC, 759 F.2d 1382 (1985), this court adopted a three-part test for reviewability under Section 825l: (1) whether the order is final; (2) whether, if unreviewed, it would inflict irreparable harm on the party seeking review; and (3) whether at this stage of the process judicial review would invade the discretion of the agency. Steamboaters, 759 F.2d at 1387-1388. Applying this test, Henwood's petition is clearly reviewable: the order is final, Henwood is irreparably harmed, and review of the order would not invade the province of FERC. "Statutory interpretation is not the exclusive province of an administrative agency." Id. at 1388. In fact, FERC itself recognized in its orders that the question was one for the courts, but now seeks to prevent adjudication of the issue.
 
 
 139
 Henwood, as the project sponsor, was "aggrieved" by FERC's change of mind. Prior to the reversal of opinion, Henwood could ignore the BLM, so far as FERC was concerned. After the ruling, even though FERC imposed no licensing conditions as a result, Henwood had a definitive FERC ruling that required it to seek, obtain and presumably comply with a BLM right-of-way permit. In fact, that ruling also left Henwood with the understandable impression that FERC believed some of BLM's permit conditions might be invalid, although it did not say which ones. Henwood was worse off in its relationships with both FERC and BLM after the 1990 orders, and if it cannot get review here, it is irreparably harmed.
 
 
 140
 FERC's ripeness argument also fails. Ripeness is a question of timing and prevents the court from deciding abstract or theoretical questions which have no concrete impact upon the parties, Abbott Lab. v. Gardner, 387 U.S. 136, 148-149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977); Assiniboine and Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil and Gas Conservation, 792 F.2d 782, 787-788 (9th Cir.1986), and turns on "the fitness of the issue for judicial decision" and "the hardship of the parties of withholding court consideration." Pacific Gas & Elec. Corp. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (quoting earlier case); see American-Arab Anti-Discrimination Comm. v. Nelson, 940 F.2d 445, 453 (9th Cir.1991).
 
 
 141
 It is difficult to postulate an issue more proper for judicial decision than that of the statutory authority of an administrative agency. This is an issue of law which the agency must also consider, but not to the exclusion of the judiciary. "While the [agency's] decision is not the last word, it must assuredly be the first." Federal Power Comm'n v. Louisiana Power & Light Co., 406 U.S. 621, 647, 92 S.Ct. 1827, 1842, 32 L.Ed.2d 369 (1972). The same ripeness considerations which led the Commission to decide the issue in Escondido, Thermalito, Held and Henwood (three times) make it appropriate for this court to likewise decide the issue.
 
 
 142
 The parties will face undesirable hardship if the issue is not reached now. FERC decided the issue at Henwood's request, reaffirmed its decision at BLM's request and reversed itself sua sponte. The question is one which is properly presented to the Commission in the first instance, and if not reached here, will simply await some later proceeding, with attendant uncertainty about the state of FERC's authority in the meantime. When will it change its mind again, and at what cost in the interim?
 
 
 143
 One final comment on ripeness. Here we have a dispute over the authority of two federal agencies, one of whom at one time had admittedly exclusive authority over hydropower projects on federal lands. While the issue was created by the passage of FLPMA, the question of the exclusivity of FERC jurisdiction will have to be separately addressed as to each agency, since BLM chose not to be a party before FERC. Even though our decision here is not the last word necessary to resolve the issue, it is the last word to FERC on the issue, at least from this court. To that extent, the target is more fixed after this case than it was before.
 
 CONCLUSION
 
 144
 We deny FERC's motion to dismiss the petitions relating to the BLM/FLPMA issue, and vacate and remand FERC's order denying rehearing on that issue. We deny the petitions for review on all other issues.
 
 
 145
 VACATED IN PART AND REMANDED.
 
 
 
 *
 The Honorable Edward Dean Price, United States District Judge for the District of California, sitting by designation
 
 
 [1]
 FERC found that the staff had incorrectly triggered the Section 10(j) negotiation process with Cal Fish and Game because staff had informed the agency that its minimum stream flow recommendations were inconsistent with those of FERC staff, not that its recommendations were inconsistent with applicable law, as stated by Section 10(j)(2). FERC staff's environmental assessment for the Henwood project was issued some six months after enactment of ECPA. At that point, FERC acknowledged it had very little experience in implementing the new 10(j) provisions
 Cal Fish and Game contended in its appeal of the Director of OHL's order that meaningful negotiations under Section 10(j)(2) had not occurred and that its recommendation of an on-site meeting of all parties as a means of resolving inconsistencies was ignored. FERC explained in its Order of May 2, 1989 that "[h]ad Cal Fish and Game understood that the conflict to be resolved rested on the unacceptable impact on project viability, it is possible that a mutually agreeable resolution of this conflict would have been achieved." FERC stated in its Order of February 15, 1990, denying rehearing, that "despite Henwood's filings regarding the financial feasibility of the Dynamo Pond Project, we cannot charge Cal Fish and Game with actual notice of a Commission belief that adoption of Cal Fish and Game's recommendations would render the project financially infeasible and would eliminate overriding public benefits."
 
 
 [2]
 We reject Cal Fish and Game's argument that FERC did not adequately assess or consider what effect reduced Green Creek flows would have upon recreational use of the creek and adjacent areas, and therefore did not adequately discharge its "public interest duties." FERC explained in its Order of February 15, 1990:
 There is no way to directly compare the recreational value of the existing pond to a condition without the pond and subsequent reversion to stream habitat. The pond is in a relatively low gradient area adjacent to a similar low-gradient stream condition upstream from the project. The upstream area receives substantial camping activity, and similar use of the pond area may occur. The apparent preference of fishermen and other recreationists for the pond area conflicts with Cal Fish and Game's negative views on preservation of the pond at the expense of stream habitat. Also, if the project is not built, access to the area of the pond by the public could become restricted, because the pond is on private lands.
 Construction of the project would ensure preservation of Dynamo Pond for recreational use and ensure public access. Failure to construct the project will likely result in loss of the pond, and potentially limited access to the pond area. A quantitative estimate of recreational opportunities that would be lost through loss of the pond is not possible, since the recreational value of the reverted stream area is unknown and the access issue is not clear. However, it is likely that some or all of the recreational use of the pond area would be eliminated without the project.
 
 
 [3]
 Order No. 464 provided as follows with regard to the application of the new waiver rule to pending license applications:
 
 
 [2]
 Application of the Rule
 This rule will be applied to all hydroelectric license applications filed after the effective date of the rule. With regard to pending license applications which do not yet have section 401 certification, the Director, Office of Hydropower Licensing, will notify the appropriate certifying agencies that the Commission will deem certification to be waived one year after the date the certifying agency received the certification request. [Emphasis added.]
 In a footnote to this statement, the Commission also provided a mechanism whereby a state agency deemed to have waived certification could, nevertheless, recommend conditions for possible inclusion in the license:
 Because the appropriate commencement date of the waiver period for certification requests for hydroelectric projects has been an unsettled question, the Commission will instruct the Director, Office of Hydropower Licensing, to notify the appropriate certifying agencies that, in the event of certification requests that under this rule are deemed to have already been waived or to be waived within 30 days of the effective date of this order, the certifying agency is invited to submit to the Commission, within 30 days of the effective date of this order, its comments and recommendations on the license application with regard to water quality. The Commission will not act on such license application until after this 30-day comment period, and will consider inclusion in the license of any water quality conditions recommended by the certifying agency. [Emphasis added.]
 
 
 [4]
 Henwood reapplied for 401 certification by letter to Cal Water dated February 11, 1988. A water rights permit was issued by Cal Water on June 16, 1988, and a certificate of water quality conformance was issued on October 3, 1988. The certificate imposed different requirements on Henwood than those in the FERC license
 
 
 [5]
 In an opinion issued shortly after the FWPA became effective on June 10, 1920, the Department of the Interior characterized it as follows:
 The act in question repeals all acts and parts of acts inconsistent therewith, and provides a complete and exclusive method for the use of public lands, reservations, and navigable waters for the development, transmission, and utilization of hydroelectric power.
 
 
 [47]
 Pub.Lands Dec. at 557
 The Attorney General opined in 1921 that the authority of the Secretary of Agriculture to approve transfers of hydroelectric power permits on national forest lands was terminated by the FWPA. He characterized the Congressional purpose as follows:
 It seems clear that it was the purpose of Congress to bring under this Act all future power development within the jurisdiction of the United States and to concentrate in the hands of the Federal Power Commission all the administrative authority thereover which was in part previously distributed among the Secretaries of the Interior, Agriculture, and War.
 Hydroelectric Power Permits, 32 Op.Att'y Gen. 525, 528 (1921).
 
 
 [6]
 SENATE COMM. ON ENERGY AND NATURAL RESOURCES, 95TH CONG., 2D SESS., LEGISLATIVE HISTORY OF THE FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976, 92-93 (Comm.Print 1978) [hereinafter cited as Legislative History of FLPMA]
 
 
 [7]
 Chevron USA v. Nat. Res. Def. Council, 467 U.S. 837, 844-845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984); United States v. Clark, 454 U.S. 555, 565, 102 S.Ct. 805, 812, 70 L.Ed.2d 768 (1982); Udall v. Tallman, 380 U.S. 1, 9, 85 S.Ct. 792, 797, 13 L.Ed.2d 616 (1965). Counsel for FERC disclaimed any deference due FERC's ruling on either side of the question
 
 
 [8]
 In fact, BLM's interpretation urged here is not the universal view of Interior. The Solicitor of the Department of the Interior, in an opinion written to the Secretary, decided the term "public lands," when used in the Paiute Tribe of Utah Restoration Act (94 Stat. 317), did not include Forest Service land. He noted this definition of "public lands" was consistent with the definition in "recent legislation, most notably the Federal Land Management Policy Act of 1976." Opinion of Solicitor Coldiron, May 7, 1982, at page 3
 
 
 [9]
 The report cited by Senator Haskell said the purposes of FLPMA were to consolidate management laws, remove conflicts and provide missing authority. BLM's interpretation would create a conflict where none existed and impliedly modify the FPA in spite of the language of 43 U.S.C. § 1701, note, § 701(g)